**Alfred T. EVERETT, Plaintiff,**

*v.*

**COVE SHIPPING, INC., Defendant.**

**and**

**Aetna Casualty & Surety Company, Intervenor.**

**Civ. A. No. 84–1231–P.**

United States District Court, S.D. Alabama, S.D.

June 19, 1987.

---

Joe E. Basenberg, Alex F. Lankford, III, Mobile, Ala., for plaintiff.

Gregory C. Buffalow, Joseph M. Allen, Jr., Mobile, Ala., for defendant.

James P. Green, Mobile, Ala., for intervenor.

## MEMORANDUM OPINION AND ORDER

PITTMAN, Senior District Judge.

### Findings of Fact

The plaintiff, Alfred T. Everett (Everett), at all times material, was employed as a tank cleaner by Metal Marine Associates (Metal). He worked for Metal cleaning tanks aboard various ships in lay-up at Tensaw River Docks, Tensaw, Alabama, and also worked for Metal as a tank cleaner on the M/V COVE SAILOR at sea.

The defendant, Cove Shipping, Inc. (Cove), at all times material, operated the COVE SAILOR.

Aetna Casualty & Surety Company (Aetna), which provided Longshoremen's and Harbor Workers Compensation Act (LHWCA) benefits to Everett pursuant to a contract of insurance with Metal, intervened, seeking to recover compensation payments it has made in accordance with LHWCA.

All of these parties are properly before the court pursuant to its admiralty and maritime jurisdiction.

On May 23, 1983, the plaintiff was injured while employed by Metal and working aboard the COVE SAILOR, a tanker vessel operated by Cove.

The plaintiff's claim centers on an incident which occurred on May 23, 1983, while plaintiff was working as a tank cleaner performing "mucking operations" aboard the COVE SAILOR. At the time plaintiff was inside Cargo Tank No. 9 Portside aboard the COVE SAILOR. His employer, Metal had been retained as an independent contractor by Cove to clean oil scales and residue from the COVE SAILOR, a process known as "mucking operations."

The accident occurred while the COVE SAILOR was at sea, en route from Freeport, Texas to Mobile, Alabama. The plaintiff reported the accident at approximately 2:15 p.m. on May 23, 1983.

The tank cleaning work was carried out by the Metal employees. Under the command of the chief mate and the boatswain, both employees of Cove, the ship's crew would Butterworth the cargo tanks which consisted of spraying the interior of the tanks with hot and cold water at high pressure utilizing a specialized Butterworthing machine. The Metal employees would spray the interior of the tanks with a chemical to further break down the petroleum residue which would be pumped overboard. The Metal employees then entered the tanks to physically remove any petroleum residue not liquified and pumped overboard during Butterworthing and chemical spraying. This final removal of residue was known as "mucking." After mucking, the chief mate would inspect the tanks and further work would be done as required.

Before the Metal employees entered the tanks to conduct the mucking activity, it was necessary for the tanks to be thoroughly ventilated by the ship's crew and then checked for oxygen content and the presence of explosive gases. This testing was done by the chief mate, and no one was allowed to enter a tank unless it had been checked and approved by him. The

mucking procedure would cause the release of additional fumes, which could make work in the tank unsafe, so the ship's crew undertook the continued ventilation of the tanks while Metal employees were inside them and the chief mate also tested the tanks periodically while men were working inside them. The chief mate had issued orders that no men were to work inside a tank which was not being actively ventilated with copas blowers. This was communicated to Metal's foreman, whose duty was to carry this information to his crew.

The plaintiff testified at trial that he slipped in the tank due to the presence of fumes emanating from the oil residue substances that he had been hired to clean, and due to the insufficient non-skid capacity of his work boots. However, when plaintiff first reported the injury on May 23, 1986, he made no mention at that time of the presence of fumes in the tank, and did not complain with respect to the non-skid capacity of his boots.

Consistent with this, the chief mate on the COVE SAILOR at that time, Mr. Gordon De Filippo, testified that he went into the tank in which the accident occurred, immediately after the accident was reported, and did not note the presence of any fumes nor had there been complaints regarding fumes in the tanks.

The chief mate also testified that it was his job to test the tanks to ensure they were sufficiently gas-free during cleaning operations, before turning the work area and tanks to be cleaned over to the independent contractor, Metal Marine Associates. The chief mate also testified that this procedure was followed with respect to Cargo Tank No. 9 and that he personally performed his own testing.

According to the chief mate, he tested the tanks with explosimeters and oxygen meters to ensure a proper atmosphere before anyone else could go inside. He also made sure the tanks were constantly ventilated with copas blowers while persons were working in the tanks. No one was allowed in the tanks, even though tested, if the copas blowers were not in use. According to the chief mate, the ship's crew handled Butterworthing and ventilation of the banks. The Metal crew performed mucking operations.

Mr. Tarulli, the medical officer, prepared the handwritten medical log within an hour after this injury was reported. Neither of Mr. Tarulli's contemporaneous reports contained any references to any complaints of fumes in the tank. Mr. Tarulli also testified that it was his practice to take down the details of any accident from the person who had the accident.

While mucking tanks, Cove provided rubber boots, shovels and buckets.

Tank mucking is hazardous work in that it is conducted in a slippery, greasy environment. Cove provided the boots which were common rubber rain boots without a non-skid bottom. Neither Cove nor Metal provided walkways for use in the tank.

The court finds no complaints had been made with respect to the presence of fumes in the tanks prior to plaintiff's injury. Further, *plaintiff himself made no complaint* to anyone prior to this incident *with respect to alleged fumes* present in the tank *or with respect to problems with his boots*, nor immediately after this incident.

With respect to the alleged fumes in the tank, plaintiff testified as follows:

Q. So you worked in there three and a half hours, roughly, and there was gas during the morning?

A. Yes, sir.

Q. Did you make any type of complaint and say it's gassy in here?

A. No, sir.

Q. Did you hear anyone else complain about it?

A. No, sir.

(Plaintiff's first deposition, May 14, 1985, page 50).

The court therefore finds, based upon the more credible testimony presented at trial, that the tanks were sufficiently ventilated, and were sufficiently free of gas before Metal employees entered them to perform mucking operations. The court further finds that tank ventilation was ongoing during the times in which the Metal

crew worked in the tanks, and that the plaintiff was not overcome by fumes at the time of his injury.

With respect to plaintiff's boots, he testified as follows:

Q. Did you have any occasion to complain about these boots before your accident?

A. No, sir.

(Plaintiff's first deposition, May 14, 1985, page 48).

On May 23, 1983, Everett's crew was directed by the chief mate to muck the # 9 port cargo tank aboard the COVE SAILOR. This tank was generally rectangular in shape and was divided into four sections by three partial bulkheads which extended across the width of the tank but only extended approximately one-third of the height of the tank. Each bulkhead contained one manhole, approximately two feet wide and three feet high which provided access to the separate sections. The floor of the tank contained "longitudinals" which extended along its length. Each longitudinal was a metal strip approximately twenty-four inches high with a horizontal flange at its top which was three to five inches in width. The longitudinals were approximately twenty-four inches apart. The longitudinals were spaced across the entire floor of the tank and also extended along the vertical outer wall of the tank.

The court also finds it to be significant that plaintiff went into the tank alone at the time of his injury. This was contrary to instructions that the chief mate had given to plaintiff's foreman David Romero. The chief mate instructed the Metal foreman Mr. Romero, whose duty was to relate the procedure to be followed to the Metal employees. There was no direct supervision by the chief mate or the vessel crew of the Metal employees. The chief mate also testified that the tanks were sufficiently free of gases or fumes before any personnel were allowed in the tanks.

The plaintiff was injured when he re-entered the tank alone after lunch to continue his work. As he was moving across the bottom of the tank in the performance of his work, he stepped onto a longitudinal to cross it, at which time he lost his balance, slipped and fell, injuring his right shoulder and right knee.

■ The court finds the plaintiff guilty of negligence in going down into the tank alone after the lunch break when the copas blowers were not in use, in violation of the ship's instructions. Cove had discharged its duty with reference to the instructions in so informing plaintiff's employer, Metal's foreman, prior to the work beginning.

The plaintiff was also negligent in stepping on the narrow flange of the longitudinal to traverse the bottom of the tank in an environment of muck in the tank and on his shoes.

■ The court further finds that it was not established by a preponderance of the evidence that had Everett been issued non-skid boots it would have prevented him from slipping as he did. It is not likely non-skid boots would have prevented a slip on the greasy, small flange of the longitudinal on which the plaintiff testified he slipped and fell. The court, therefore, concludes that the preponderance of the evidence fails to establish whether the failure to issue the non-skid boots was the proximate cause of the plaintiff's injury.

There has been no showing that Cove Shipping, Inc. should have reason to know their instructions were not being followed, and significantly, no showing that any complaints had been made with respect to fumes.

The court, therefore, finds the more credible testimony presented was that the tanks were sufficiently ventilated, and were sufficiently free of gas before Metal employees went into perform mucking operations. The court also finds that tank ventilation was ongoing during the times in which the Metal Marine crew worked in the tanks, and that the plaintiff was not overcome by fumes at the time of his injury.

After he fell, Everett was removed from the tank by either a sling or a stretcher and was taken to his room where he received medical treatment. The ship arrived in Mobile, Alabama, approximately one week af-

ter his accident, and during this time he did not work.

Upon the ship's arrival in Mobile, Everett was taken to Springhill Memorial Hospital Emergency Room, where he was given preliminary treatment and was then referred to an orthopaedic surgeon.

Immediately after the accident the plaintiff required immobilization for a period of time. In October, 1983, he underwent orthopaedic surgery on the right knee. In September, 1984, a new surgical procedure, known as Andrews Reconstruction Procedure (ARP), was performed on the right knee. In December, 1984, the plaintiff claims he began to experience pain, a "clicking" in his left knee rising from overstress because of the inability to fully use his right leg, with the result that his right knee buckled, he fell, reinjuring the right knee and injuring the left knee, for which surgery was required. The plaintiff claims loss of wages, as well as permanent injury and pain and suffering.

*Conclusions of Law*

Prior to 1972, an injured longshoreman could recover against the shipowner if he could prove that he had been injured as a result of the unseaworthiness of the vessel. Under this broad standard, the shipowner was liable even if the unsafe condition had been created by the stevedore. In 1972, Congress amended the LHWCA, substituting negligence for unseaworthiness as the shipowner's standard of care. 33 U.S.C. § 905(b).

The Supreme Court has defined the scope of a shipowner's duty of care to the stevedore and its hired longshoremen. In *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Court differentiated between the duty owed for conditions which arise during the stevedore's operations and the duty owed for conditions existing prior to or contemporaneous with the commencement of the stevedore's operations.

■ Before the stevedore begins its work, a shipowner must exercise care to make the portions of the ship that it turns over to the stevedore safe. In discharging this duty, the ship may rely on the stevedore's performing its task with reasonable care. The shipowner must also warn the stevedore of hidden unsafe conditions on the ship of which the shipowner is, or should be, aware. *Scindia*, 451 U.S. at 165, 101 S.Ct. at 1621. *See Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir.1982).

The Court limited the shipowner's liability once the stevedore has commenced its operations, stating that the owner has no general duty by way of supervision or inspection to discover dangerous conditions that develop in the confines of the cargo operations that are assigned to the stevedore. *Scindia*, 451 U.S. at 172, 101 S.Ct. at 1624. The policy underlying this holding had been expressed earlier when the Court had recognized that the stevedore is in the best position to avoid accidents during cargo operations and that the shipowner should be allowed to rely on the stevedore's expertise and warranty to perform his work competently. *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).

■ The Court did make an exception to the general rule which suggests a absence of any duty on the part of the shipowner to protect a stevedore's employees during cargo operations. The duty will arise if two conditions are met. If the shipowner becomes aware during the stevedore's work that the ship or its gear poses a danger to the longshoremen, and if the shipowner also learns that the stevedore is acting unreasonably in failing to protect the longshoremen against the danger, then the shipowner acquires a duty to intervene and protect the longshoremen. The shipowner can have knowledge of a defect if the defect develops during the stevedore's operations and the shipowner has actual knowledge, or if the defect exists at the outset and the shipowner "must be deemed" to have knowledge of it. *Hill*, 674 F.2d at 451 quoting *Scindia*, 451 U.S. at 176, 101 S.Ct. at 1626.

■ The rationale of *Scindia* is not limited to stevedoring operations. It clearly

applies to any independent contractor and its harborworker employees covered by the LHWCA and working aboard ship. *Hill*, 674 F.2d at 451. Applying *Scindia* to the facts of this case, the court sees no basis for imposing liability on the defendant, Cove.

Under the first prong of the *Scindia* decision, in order to establish negligence on the part of the ship, the plaintiff must prove that Cove did not exercise reasonable care to make sure that the portions of the ship which it turned over to Metal were safe. In our case the ship's crew was responsible for the Butterworthing procedure and for ventilating the tanks while the plaintiff and other members of the mucking crew were down in the cargo hold.

Before the Metal employees entered the tanks to conduct the procedure known as mucking, it was necessary for the tanks to be thoroughly ventilated by the ship's crew and then checked for oxygen content and the presence of explosive gases. This testing was performed by the chief mate. The chief mate had issued orders that no one was to enter or work inside of a tank which was not being actively ventilated. This standing order was communicated to Metal's foreman whose duty it was to convey this information to his crew.

Therefore, in the arrangement between Cove and Metal, Cove was obligated to Butterworth the tanks and then keep them ventilated while Metal's crew performed its duties. The plaintiff has not alleged at any point during these proceedings that the defendant was negligent in either conducting the initial Butterworthing or in testing the tanks.

 The plaintiff does contend, however, that he was not personally informed that he was not to enter a tank which was not being ventilated. However, his foreman was informed of this policy and this court agrees with the fifth circuit which stated in *Hill* that "*Scindia* teaches that the ship is entitled to assume that the independent contractor aboard ship will act reasonably with a view towards the safety of its employees. [451 U.S. 172, 101 S.Ct. 1624]." *Hill*, 674 F.2d at 452. When the chief mate issued this order to Metal's foreman he discharged the duty of care Cove had to warn the tank cleaning crew. *Scindia*, 451 U.S. at 165, 101 S.Ct. at 1621.

Under the principles espoused in *Scindia*, the court must next consider the vessel's duty to the plaintiff under § 905(b) once Metal's tank cleaning operation had begun. *Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622. The Court held that "we cannot agree that the vessel's duty to the longshoreman requires the shipowner to inspect or supervise the stevedoring operation. Congress intended to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore." *Id.* at 168, 101 S.Ct. at 1622–23.

In *Hill*, suit was brought against a shipowner, Texaco, by an employee of an independent contractor that Texaco had hired to determine the effect of rust on the thickness of the tank walls. Hill was injured when he fell from the wall of a tank he was inspecting. He charged the ship with negligence under § 905(b) of the LHWCA. On the day of the accident, because it had been drained of ballast water only three days earlier, the tank in which Hill was working was wet and slippery. The tank walls were also covered with loose rust. As Hill was climbing down the walls of the tank he lost his footing and fell thirty feet. Because Hill wore no safety belt or safety lines to break his fall, he fell to the tank floor. The fifth circuit concluded that there was no basis for holding Texaco liable for Hill's injuries under the guidelines set forth in *Scindia*.

Hill's injury occurred when the operations—in that case, an inspection of vessel tanks—were underway. Everett's injury also occurred when the operations were underway—here, the removal of petroleum residue from the ship's tanks or "mucking." The court held in *Hill* that "[u]nder *Scindia*, Texaco had no duty to oversee this work to make sure it was conducted safely. Texaco was entitled to rely on [the independent contractor's] expertise to per-

form his job with reasonable precautions." *Hill* at 451.

The court, therefore, finds that Cove breached no duty to the plaintiff under the requirements of *Scindia* or *Hill*.

■ The court held in *Hill* that the shipowner was not liable because it "had no knowledge that [the independent contractor] was permitting Hill to climb [inside the tank] without safety equipment. In the absence of such knowledge, Texaco was not negligent in failing to act." *Id.* 674 F.2d at 451. In the case, *sub judice*, the testimony of all of the witnesses is consistent and permits the court to conclude that Everett made no complaints regarding the presence of the fumes in the tanks prior to the accident. The court, therefore, must conclude that Cove cannot be held liable for 905(b) negligence, in that it had no knowledge that Metal was allowing Everett to perform mucking operations in tanks when the copas blowers were not working. The court has found the plaintiff was guilty of negligence when he entered the tank alone when the copas blowers were not working, contrary to instructions.

■ Arguably, Everett's injury could have been caused, at least in part, by the slippery nature of the oil residue substance which the plaintiff was hired to clean. In § 905(b) third party actions of this type, a shipowner cannot be held liable for negligence if the very reason for the plaintiff's employment was to correct a condition aboard ship which allegedly caused the accident. In *Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030 (5th Cir.1977), the shipowner hired an independent contractor to free a barge of residual gas vapors. One of the contractor's employees sued the ship after an explosion injured him during the gas freeing process. The court held that the ship had not breached a duty to the employee because "[t]he precise reason for the plaintiff's employment was to make an unsafe condition safe." *Id.* at 1036. The court concludes Cove had no duty to provide platforms for Metal employees to traverse the bottom of the tank.

The Supreme Court rendered a decision in *West v. United States*, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959), which lends support to the rationale in *Hess*.

It appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe. The respondent, having hired [the independent contractor] to perform the overhaul and reconditioning of the vessel ... was under no duty to protect the petitioner from risks that were inherent in the carrying out of the contract.

361 U.S. at 123, 80 S.Ct. at 193.

The court finds that here, as in *West*, the risks faced by the plaintiff were inherent in the carrying out of the contract.

The court has found the plaintiff was guilty of negligence in stepping on the narrow flange of the longitudinal to traverse the bottom of the tank.

The sole remaining issue is the negligent act of Cove in failing to supply non-skid boots. The court has found that the plaintiff has failed to establish by a preponderance of the evidence that had he been wearing non-skid boots they would have prevented him from slipping when he stepped on the narrow flange of the longitudinal; therefore, the plaintiff has failed to establish by a preponderance of the evidence that the defendant Cove's negligence was the proximate cause of his injury.

The court, for the reasons set out above, finds for the defendant Cove Shipping, Inc. and against the plaintiff Alfred T. Everett.